**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

Case No. 6:17-cv-01624-PGB-KRS

James J. Aboltin and Pamela J. Knight, individually
And of behalf of all others similarly situated,

      Plaintiffs,

v.

Jeunesse, LLC aka Jeunesse Global, Inc., a Florida
Limited liability company, MLM Mafia, Inc., a
Nevada corporation, Online Communications, LLC,
a Wyoming limited liability company, Wendy R. Lewis,
an individual, Ogale "Randy" Ray, an individual, Scott
A. Lewis, an individual, Kim Hui, an individual, Jason
Caramanis, an individual, Alex Morton, an individual,
Kevin Giguere, an individual, John and Jane Does 1-100,
Individual natural persons, and ABC Corporations,
Companies, and/or Partnerships 1-20,

      Defendants.

---

**BRIEF IN SUPPORT OF MOTION FOR FINAL APPROVAL**
**OF PROPOSED CLASS ACTION SETTLEMENT**

Defendants Jeunesse, LLC, Wendy R. Lewis, Ogale Ray, Scott A. Lewis, Kim Hui and

Kevin Giguere (collectively, "Settling Defendants"), join in and support the motion by

plaintiffs James J. Aboltin and Pamela J. Knight ("Plaintiffs") for final approval of the parties'

proposed class action settlement in this matter.  Settling Defendants write separately to address

from their perspective the contentions made in the *amicus curiae* brief (Dkt. No. 283) filed by

Truth in Advertising, Inc. ("TINA"), and by the single objector, Helen Xiong (Dkt. No. 284).

As explained below, all of these contentions are factually and/or legal incorrect.

## I.     INTRODUCTION

The proposed Settlement includes no admissions of wrongdoing and, more than that, Settling Defendants believe strongly that they have operated lawfully at all times.  Jeunesse has done business properly as a multi-level marketer for nearly a decade.  Over 200,000 people in the United States have executed agreements to become independent distributors of Jeunesse products, paying a nominal fee (usually $49) for "starter kit" materials as part of the process. Before Plaintiffs filed this lawsuit, none of those people had asserted claims like Plaintiffs'. Settling Defendants believe Plaintiffs' claims lack merit and, had the case not settled, Settling Defendants believe they would have disproved Plaintiffs' claims.

At the time Settling Defendants entered into the proposed settlement, this Court had *sub judice* both a motion to dismiss all of Plaintiffs' claims for failure to state a claim upon which relief may be granted and a motion to deny class certification.  Further, Plaintiffs—like all persons who entered into contracts to become independent distributors for defendant Jeunesse LLC—agreed to resolve all disputes about their service as distributors through binding *individual* arbitration conducted by the American Arbitration Association, not in court. Settling Defendants therefore also moved to compel arbitration, and this Court recently held in a different action that Jeunesse's arbitration clause is enforceable and contains a valid delegation clause requiring disputes over arbitrability to be resolved by the arbitrator.  *See AMC Pinnacle, Inc. v. Jeunesse, LLC*, Case No. 6:18-cv-1102-PGB-DCI, 2018 WL 6267314 (M.D. Fla. Nov. 30, 2018) (Byron, J.) (denying Jeunesse distributor's motion for preliminary injunction against pending arbitration initiated by Jeunesse).  The arguments made by the *AMC Pinnacle* distributor against enforcement of Jeunesse's arbitration clause were similar to

(indeed, likely copied from) Plaintiffs' arguments in this case. Settling Defendants believe this Court would have compelled Plaintiffs' claims into individual arbitration for the same reasons.

Settlements, of course, are compromises. This proposed settlement will cost more than Settling Defendants wanted to pay and represents less than Plaintiffs hoped to receive. Both sides entered into the deal clear-eyed regarding the risks they faced had the litigation proceeded. Settling Defendants recognize the risks and costs of continuing to litigate, and Settling Defendants fully support the settlement into which they have entered.

The Settlement necessarily has a claims process. One reason the Settling Parties could not avoid a claims process is that although nearly 250,000 people paid a small fee to become Jeunesse independent distributors, giving them the right (among others) to purchase Jeunesse products at the distributor discount of 20% or more below retail prices, only these people themselves know whether they intended to build a business reselling Jeunesse products or simply wished to buy discounted products for personal consumption. With a 20 percent discount at stake, one need only have intended to purchase Jeunesse products having a retail value of $250 or more, at any future time, for the payment of a $49 starter fee to make economic sense. The need for individual inquiries to differentiate between discount-seeking consumers and actual distributors would have, in Settling Defendants' view, posed an insurmountable hurdle to certifying a litigation class. For settlement purposes, the claims process allows distributors to self-identify as having enrolled with the intention to build a business, rather than simply wanting the distributor discount.

A second principal reason the settlement had to include a claims process is because only distributors themselves know the extent to which they succeeded in recouping their $49

starter kit fees.  Those who operate a business selling Jeunesse products and building teams of other distributors to do so can spend as much or as little time on that enterprise as they wish, and they define success in highly individualized ways.  They do not have to report their resale transactions to Jeunesse, so only the distributors themselves know if they attained the goals they set for themselves.  That, too, would have precluded class certification for litigation purposes, in Settling Defendants' view and the view of Settling Defendants' expert witness. The claims process in the proposed Settlement, by contrast, allows distributors to self-report whether they earned less than the starter-kit fee in commissions or retail sale profits.  Jeunesse itself does not have this information.

A third principal reason for a claims process is that Jeunesse obviously cannot know whether a distributor discarded a product s/he had purchased, and if so, whether the distributor had purchased that product intending to resell it.  The settlement allows distributors to self-identify any products they purchased for resale but discarded rather than reselling it or returning it to Jeunesse.  This need for self-identification would have precluded recovery for discarded products in the litigation context, and this benefit only could have been part of the settlement through a claims process.

Settling Defendants respectfully submit that this compromise on which they agreed with Plaintiffs has been successful:  The $2.5 million settlement payment appears sufficient to pay all claims without any *pro rata* reductions.  Anyone who paid the $49 fee for distributor starter materials intending to build a business, but who did not recoup at least that much through product resales or otherwise, can claim a full refund for that fee.  Although Jeunesse— which always has had a liberal product return policy—sees no reason why anyone should have

discarded unsold products, those who assert they did discard products can claim a 50 percent refund with a simple attestation.  The Settlement then further liberalized Jeunesse's already-generous return policy:  Anyone still in possession of products, even if they are beyond their expiration date, can return them for a 90 percent refund as part of the settlement.  Those refunds do not count against the $2.5 million.

It is important to remember that until Plaintiffs filed this case in July 2016, no Jeunesse distributors had asserted claims like theirs in any forum.  Jeunesse is not aware of any regulatory complaints, either.  Settling Defendants believe—and the Settlement claims process seems to have borne out their belief—that most distributors simply are not aggrieved in the manner Plaintiffs claimed.

Nearly 20,000 distributors visited the settlement website to learn more information about the proposed Settlement.  Those seeking payments completed straightforward claim forms.  Of more than 200,000 distributors who received direct notice of the Settlement, only *one* objected.  That objection comes from a plaintiff who filed her own putative class action complaint after the parties had settled this matter.  But she also opted out of the Settlement Class, meaning she has no standing to object.  Just as importantly, her arguments, to the extent the Court wishes to consider them, lack merit, as Settling Defendants will explain below.

The proposed settlement is eminently fair and reasonable, and the class's reaction has been overwhelmingly positive.  This Court should grant it final approval.

## II.    HELEN XIONG'S IMPROPER OBJECTION

### A.    *Ms. Xiong, Having Opted Out of the Class, Lacks Standing to Object.*

The sole objection in this case comes from Helen Xiong.  Not long after the June 29, 2018, public filing (Dkt. No. 252) in which the Settling Parties here advised this Court that they had reached a class action settlement in principle, Ms. Xiong filed her own putative class action lawsuit against the Settling Defendants in the Central District of California.  *See Xiong v. Jeunesse Global LLC*, No. 8:18-cv-1430-DOC-KES (C.D. Cal., compl. filed Aug. 10, 2018).  Ms. Xiong's counsel is no stranger to this case:  He filed a separate putative class action last year raising the same claims against the same defendants.  Jeunesse moved to transfer the case, to compel arbitration, and to dismiss the plaintiffs' claims.  *See Tsai v. Jeunesse LLC*, No. 2:17-cv-216-ODW-GJS (C.D. Cal.), Dkt. No. 31 (filed Apr. 17, 2017).  Ms. Xiong's counsel then voluntarily dismissed that complaint without responding to the motion.

Ms. Xiong opted out of the Settlement Class on November 26, 2018.  *See* Dkt. No. 284-3 (opt-out form).  The Settlement Administrator included Ms. Xiong on its list of opt-outs.  *See* Dkt. No. 285-1, Ex. 3 (Ms. Xiong is opt-out #19 of 21).  Because Ms. Xiong opted out of the Settlement Class after filing that lawsuit, she is not a member of the Settlement Class and therefore does not have standing to object to the settlement.  The Court should disregard her objection for that reason.  Although Settling Defendants will address Ms. Xiong's substantive arguments below, it is important for the Court to acknowledge Ms. Xiong's lack of standing.  Because she lacks standing to object, she also cannot appeal the Settlement's approval.  *See, e.g., Harper v. C.R. England, Inc.*, __ Fed. Appx. __, 2018 WL 3860471, at *4 (10th Cir. Aug.

14, 2018) (one who opted out of the settlement cannot appeal from its approval).  The court should make clear that lack of standing in its order.

Numerous cases make clear that a successful opt-out like Ms. Xiong "cannot also file an objection to the Settlement."  *Jones v. United Healthcare Servs., Inc.*, No. 0:15-cv-61144-RLR, 2016 WL 8738256, at *4 (S.D. Fla. Sept. 22, 2016).  *See also, e.g., Zamora v. Lyft, Inc.*, No. 16-cv-2558-VC, 2018 WL 5819511, at *1 (N.D. Cal. Nov. 6, 2018) (class member "cannot both object and opt out under the terms of the settlement").  "[I]t is well established that class members may either object or opt out, but they cannot do both."  *Carter v. Forjas Taurus S.A.*, No. 1:13-CV-24583-PAS, 2016 WL 3982489, at *13 (S.D. Fla. July 22, 2016), *quoting* Newberg on Class Actions § 13.23 (5th ed.) ("Class members who opt out of the class…are no longer considered class members, and hence Rule 23 does not give them standing to object to the settlement.").  *See also, e.g., In re NFL Players Concussion Injury Litig.*, 307 F.R.D. 351, 423 (E.D. Pa. 2015) (same); *Reid v. SuperShuttle Intern., Inc.*, No 08-CV-4854 (JG) (VVP), 2012 WL 3288816, at *3 n.1 (E.D.N.Y. Aug. 10, 2012) ("by opting out, these class members relinquished their standing to formally object to the settlement").  "Opting out of a settlement and choosing to object logically are mutually exclusive options."  *Olden v. Lafarge Corp.*, 472 F. Supp. 2d 922, 930-31 (E.D. Mich. 2007) (explaining rationale for requiring choice between objecting and opting out).

Ms. Xiong is not a member of the Settlement Class.  She is releasing no claims pursuant to the Settlement, and is not in any way bound to it.  She lacks standing to object.

**B.**     *Ms. Xiong's Substantive Arguments Against the Settlement Lack Merit.*

Settling Defendants recognize that the Court, in considering the fairness of the proposed Settlement, will want to consider all arguments relevant to the matter.  To that end, Settling Defendants will address the dubious merits of Ms. Xiong's objection, despite her lack of standing, and even though Ms. Xiong did not support her objection with a declaration or other evidence.  *See In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1336 (S.D. Fla. 2011) (denying objections that are "completely unsupported in the record" and lacking "even a single affidavit to provide facts…supporting their positions").  None of Ms. Xiong's arguments offer a valid reason why the Settlement should not be approved.

Ms. Xiong's principal argument is that this Court either cannot or should not approve a settlement release that applies to distributors residing in California.  That argument is unfounded for numerous reasons, two of which have been addressed already in this case.  First, Ms. Xiong would not be able to litigate *any* claims against Jeunesse in California.  Her suit, if allowed to proceed at all, almost certainly would be transferred to this Court, as the instant suit was after Plaintiffs initially filed it in the District of Arizona.[1]  Indeed, Jeunesse's arguments for transferring Ms. Xiong's claims are significantly *stronger* than those that succeeded in this case.  Due to a short-lived website error, Plaintiff Abolitin's agreement with Jeunesse did not

---

[1]     Ms. Xiong's brief (at 9) has an odd discussion of *Bristol-Myers Squibb v. Superior Court of California*, 137 S. Ct. 1773 (2017), a mass tort case.  If her argument is that California is not a proper venue to litigate her claims, Settling Defendants agree.  If her argument is that a class action settled in Florida cannot release California claims, *Bristol-Myers* does not support that argument.  Indeed, the second case Ms. Xiong cites in the same paragraph, *Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc.*, No. 17-cv-564 NC, 2017 WL 4224723, at *5 (N.D. Cal. Sept. 22, 2017), declined to extend *Bristol-Myers*'s jurisdictional holding to class actions at all.  *See id.* ("The Court has personal jurisdiction over Dr. Pepper as to the putative nationwide class claims.")

include an Orlando venue clause.  Ms. Xiong's agreement does have such a clause, however, mandating venue in this Court of any non-arbitrable dispute.  Second, Ms. Xiong is subject to the same individual arbitration agreement this Court found binding in *AMC Pinnacle*.

Ms. Xiong's argument is wrong for other reasons, too.  Her agreement with Jeunesse requires disputes to be adjudicated under Florida law.  Ms. Xiong therefore could not pursue claims under California law in any forum.  Further, her claim to have been an "employee" of Jeunesse, subject to California labor law, has no substance.  Leaving aside that Ms. Xiong's agreement with Jeunesse made clear she was an independent contractor and not an employee, there is no dispute that Ms. Xiong and all other Jeunesse distributors controlled their own hours, place of work, etc.  They could spend as much or as little time as they wished building a Jeunesse business and set their own schedules.  They thus fit no definition of "employees" under the laws of California or any other jurisdiction.  Notably, Plaintiffs here did not attempt any kind of "employment" claim arising from their time as Jeunesse distributors.

California's Private Attorney General Act allows only "aggrieved employees" to seek civil penalties arising out of violations of the California Labor Code.  Cal. Lab. Code § 2699, sub. (c).  Ms. Xiong was not an employee of Jeunesse, aggrieved or otherwise.  In *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 769 P.2d 399 (Cal. 1989), a case involving migrant agriculture laborers, the California Supreme Court set forth the test for determining whether ostensible "independent contractors" actually are employees entitled to protections as such.  "[T]he right to control work details is the most important or most significant consideration," *id.* at 404 (internal quotations omitted), and in *Borello*, the growers "retained absolute overall control of the production and sale of the crop," *id.* at 407.  Ms. Xiong, similarly, maintained

full control over when, where, and for how long she would work on matters pertaining to

Jeunesse.  "[A]dditional factors" relevant to the control analysis include:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

*Id.* at 404.  The California Supreme Court reaffirmed this test in *Ayala v. Antelope Valley*

*Newspapers, Inc.*, 327 P.3d 165, 172 (Cal. 2014), confirming that assertion of a right of

"complete control . . . with respect to all details" is the touchstone.

Misclassification cases usually turn on allegations such as an alleged employer's

control over work schedules, vehicles driven, uniforms worn, etc., and prohibitions on outside

work.  *See e.g., Guitierrez v. Carter Bros. Sec. Servs.*, No. 2:14-cv-351-MKE-CKD, 2014 WL

5487793, at *1 (E.D. Cal. Oct. 29, 2014); *Hennighan v. Insphere Ins. Solutions, Inc.*, No. 13-

cv-638-JST, 2013 WL 1758934 (N.D. Cal. Apr. 24, 2013), at *4-5.  Merely "monitor[ing] sales

agents' productivity and set[ting] goals for them," without dictating "the manner by which

agents had to achieve those goals," does not suffice.  *Comparetto v. Allstate Ins. Co.*, No. LA

CV11-09206 JAK (FFMx), 2014 WL 11514474, at *6 (C.D. Cal. July 24, 2014).  Ms. Xiong

can make no such claims.  California courts dismiss claims like hers that lack details about

hours worked, expenses not being reimbursed, etc.  *See, e.g., Tan v. GrubHub, Inc.*, 171 F.

Supp. 3d 998 (N.D. Cal. 2016).  *Cf. Poole v. Tritchler*, 165 F.3d 917 (9th Cir. 1998)

(unpublished) (affirming summary judgment because plaintiff retained the right to control the means and manner of her work); *Sahinovic v. Consol. Delivery Logistics, Inc.*, No. C 02-4966 SBA, 2004 WL 5833528, at *9-10 (N.D. Cal. Sept. 13, 2004) (same); *Saleem v. Corp. Trans. Grp, Ltd.*, 854 F.3d 131, 140 (2d Cir. 2017) (independent contractors could not meet federal definition of "employee" where they "independently determined…the manner and extent of their affiliation" with the alleged employer and "the degree to which they would invest" in their businesses).

The Jeunesse Policies & Procedures document to which Ms. Xiong, like Plaintiffs here, agreed, set forth a "Code of Conduct" requiring distributors to be "honest and fair in [their] dealing," "courteous and respectful of every person I contact in the course of my Jeunesse independent activities," and not to "misrepresent Jeunesse products or the Rewards Plan."  The document also specified certain statements that distributors must not make, such as to imply that Jeunesse products "have been approved, reviewed or endorsed by any government agency," are "FDA approved," or "that any . . . ailment or disease can be improved by consumption, use or application of the product."  First Amended Complaint Ex. E (Dkt. No. 123-5) Ex. E ¶¶ 3.3, 3.4.  That was the extent of "control" by Jeunesse.  Each distributor "is encouraged to set up his/her own hours and to determine his/her methods of sales and promotions, as long as he/she complies with the terms of the Agreement."  *Id.* ¶¶ 1.1-1.3.  Ms. Xiong, therefore, could not win a California labor law claim, even if she could surmount the obstacles to suing in California at all.  Jeunesse, notably, made all of these arguments in its motion to dismiss the *Tsai* complaint that Ms. Xiong's counsel filed last year.  He dismissed

that complaint voluntarily without responding to these arguments.  *See Tsai*, Dkt. No. 43 (voluntarily dismissal filed on May 22, 2017).

As for Ms. Xiong's claim that this Court supposedly *cannot* oversee the release of California state law claims, none of the cases she cites support her argument.  This Court unquestionably has *in personam* jurisdiction over all members of the putative Settlement Class "because they received the requisite notice and due process required by the United States Supreme Court."  *Checking Account*, 830 F. Supp. 2d at 1341, *citing Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985).  Nothing more is required.  Ms. Xiong cites the antitrust case of *In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365 (S.D. Fla. 2001), but that case concerned only a pleading-stage challenge to certain plaintiffs' ability to litigate claims that the defendant violated the antitrust laws of states where they did not reside.  In an earlier *Checking Account* decision, No. 1:09-MD-2036-JLK, 2016 WL 5848730, at *4 (S.D. Fla. July 5, 2016), the court recognized that the question of which states' laws can be adjudicated as part of a classwide resolution is more properly addressed at the class certification stage.  "Plaintiffs are not attempting…to gain access to state statutes whose protection they do not warrant, but rather, to seek redress for what they allege to be common injuries suffered by [putative class members], nationwide….  The Court's consideration of the standing issue as a precursor to class certification is not compelled either by precedent, logic, or case management considerations."  *Id.* (distinguishing *Terazosin Hydrochloride*).

Plaintiffs in this case brought federal claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), alleging that Jeunesse operated an unlawful "pyramid scheme," and proposed to adjudicate those claims on behalf of a nationwide class.  They also

pleaded nationwide class action claims under state law on an "unjust enrichment" theory.  The settlement would compromise those claims on behalf of a nationwide class, and it is entirely normal for putative class members, as a condition of settlement, to release all claims of a similar character.  *See, e.g., Wilson v. Everbank*, No. 14-CIV-22264-BLOOM-VALLE, 2016 WL 457011, at \*21 (S.D. Fla. Feb. 3, 2016) ("In class action settlements, releases may include all claims that arise out of the same course of conduct alleged in the Complaint, known and unknown claims, or even claims over which the Court lacked jurisdiction."),[2] *citing Thomas v. Blue Cross & Blue Shield Ass'n*, 333 Fed. App'x 414, 420 (11th Cir. 2009); *Lipuma v. American Express Co.*, 406 F. Supp. 2d 1298, 1317 (S.D. Fla. 2005) (class action releases "may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct"), *quoting Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005).

Any number of Florida class actions settlements—including each of those cited in this and the prior paragraph—had the same Cal. Civ. Code § 1542 release of "unknown claims" made part of the instant Settlement.  *See also, e.g., Fernandez v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 15-22782-Civ-COOKE/TORRES, 2017 WL 7798110, at \*5 (S.D. Fla. Dec. 18, 2017).  That is because, in part, "[a] release of the Settlement Class's claims is a necessary

---

[2]    In an earlier decision in *Wilson v. Everbank, N.A.*, 77 F. Supp. 3d 1202, 1230 (S.D. Fla. 2015), the court distinguished *Terazosin Hydrochoride* just as *Checking Account* did: "Here, the named Plaintiffs each have standing to assert their common law…claims under the laws of Florida, New York, and Illinois, respectively….  The Courts' consideration of the standing issue [to pursue claims under other state statutes on behalf of a nationwide class] is not compelled either by precedent, logic, or case management considerations."  As noted above, the *Wilson* court later approved a national class action settlement releasing California claims.

precondition to [d]efendants' agreement to settle; without it, [d]efendants could be subject to individual lawsuits by individual class members for years to come." *Wilson*, 2016 WL 457011, at *21. "Class members who wish to retain their claims and except themselves from . . . the release, have been given the opportunity to do so by opting out"—as Ms. Xiong did. *Id.* As courts consistently recognize, "[t]his is fair, reasonable, and sufficient under the law[.]" *Id.*

Plaintiffs here also pleaded claims under their states' false advertising and consumer fraud laws as alternatives to their RICO claim. For any release to be complete, therefore, settlement class members must release claims they could have pleaded under those same theories. It is indisputable that the Court can approve a nationwide class action settlement where state consumer fraud laws are pleaded in the alternative to federal claims, as courts often do. *See, e.g., Montoya v. PNC Bank, N.A.*, No. 14-20474-CIV-GOODMAN, 2016 WL 1529902, at *8 (M.D. Fla. Apr. 13, 2016) (approving nationwide class action settlement that covered, among other things, "claims for violations of state consumer fraud statutes and the federal RICO statute"); *id.* at *26 (recognizing that "[i]n class action settlements, releases may include all claims that arise out of the same course of conduct alleged in the Complaint, known and unknown claims, or even claims over which the court lacked jurisdiction") (citation omitted); *Checking Account*, 830 F. Supp. 2d at 1338-39 (approving nationwide class action settlement where plaintiffs pleaded, among other things, defendant's "conduct violated certain state unfair trade practices statutes, and resulted in its being unjustly enriched" even where court had previously dismissed certain state statutory claims).

It should be clear, therefore, that this Court has ample authority to approve the proposed nationwide release of claims called for in the Settlement.  That failed argument represents the bulk of Ms. Xiong's objection.  The rest of her arguments have even less merit.

Ms. Xiong contends (at 12) that one who paid the $49 fee for starter kit materials intending to be a retail customer, rather than intending to build a business reselling Jeunesse products, still can seek return of that fee under California's Endless Chain Law.  Ms. Xiong cites no support for this theory and none exists.  As Ms. Xiong admits later in her brief (at 13), "if…products are purchased by a legitimate retail customer," then "the revenue [is] legitimate retail revenue."  The need for individual inquiries into each nominal distributor's intent would doom certification of a *litigation* class in this case and explains the need for a claims process.

Ms. Xiong argues (at 14-16) that the settlement gives rise to intra-class conflicts, but her brief does not explain that argument.  The only case she cites is *In re Pet Foods Liab. Litig.*, 629 F.3d 333, 355 (3d Cir. 2010).  In that case, however, the Third Circuit found *no* intra-class conflicts requiring subdivision of a settlement class.  None exist here, either.[3]

Ms. Xiong's brief (at 3) seems to suggest that she or other California-based distributors could assert a claim against Jeunesse under California's Seller Assisted Marketing Plan Act ("SAMP").  But Ms. Xiong's lawsuit pleads no such claim, nor could it.  The SAMP, Civ. Code § 1812.200 *et seq.*, applies only to business opportunities requiring a minimum

---

[3]     Ms. Xiong objects that Settlement Class Members are releasing claims they may have against *other distributors* regarding Jeunesse.  This provision is necessary because both Ms. Xiong and Plaintiffs here have asserted claims against Jeunesse *and fellow distributors*, including Settling Defendant Kim Hui.  Settlement Class Members only are releasing claims *related to Jeunesse* against Jeunesse, its employees, and fellow distributors (*i.e.*, people in their "upline").  They are not releasing claims *unrelated to Jeunesse* against other people who happen to be fellow Jeunesse distributors.

investment of $500.  Jeunesse's starter kit materials cost $49, less than a tenth of that.  Ms. Xiong's counsel did not assert a SAMP claim in the dismissed *Tsai* suit, either.

Ms. Xiong contends that settlement class members could have received a 50% refund for discarded products even without the Settlement.  *See* Dkt. No. 284 at 4 (50% refund "is nothing more than a distributor may otherwise receive under the applicable documents by which Jeunesse is governed").  Not so.  Nothing in Jeunesse's terms and conditions allow distributors to seek partial (or any) refunds for products they discarded.  Those terms allow for *return* of unopened products within a limited time window, usually a year after purchase, and Jeunesse waived that limitation as part of the settlement.  Only through the Settlement is Jeunesse offering multiple benefits to class members that exceed its normal return policies.

Finally, Ms. Xiong (at 12) takes issue with the provision of the Settlement terminating a distributor's agreement if s/he files a claim for benefits.  This step, however, is entirely consistent with the Settlement's aims.  The purpose of the Settlement is to address Plaintiffs' claims that some Jeunesse distributors *tried and failed* to build a business reselling Jeunesse products.  Those that *succeeded*, and who are receiving ongoing commissions from their and their downline distributors' sales, are not eligible for benefits.  Those who are still trying can return the Jeunesse products they could not sell pursuant to Jeunesse's normal procedures.  The settlement, by design, is meant for people who either explicitly abandoned any intention to build a Jeunesse business or recently have ceased to try.

The Court, too, should not ignore the self-interested nature of Ms. Xiong's objection. Ms. Xiong's counsel, Blake Lindemann, sued Jeunesse previously (the *Tsai* case noted above) but voluntarily dismissed those claims after Jeunesse moved to transfer, dismiss, and/or compel

arbitration.  He also has sued other multi-level marketing companies, never successfully.  As explained in the footnote, in cases where arbitration agreements applied, courts compelled Mr. Lindemann's clients into arbitration.[4]  In the single case where the defendant (The Sunrider Corporation) had no arbitration agreement, Mr. Lindemann's client lost on summary judgment after her deposition exposed multiple falsehoods that Mr. Lindemann had pleaded in that plaintiff's complaint.  Before granting summary judgment, the court in that case also severely questioned Mr. Lindemann's fitness to serve as class counsel, ordered him to bring in more experienced counsel to lead the case, and expressed severe doubts about his ability to obtain class certification.  Plaintiffs here, by contrast, have been represented by experienced class counsel who litigated their case aggressively and well.

The remainder of Ms. Xiong's arguments merely duplicate the assertions made in the *amicus* brief filed by TINA, and will be addressed below.

## III.   TINA's *AMICUS* ARGUMENTS

Both TINA and Ms. Xiong speculate that the $2.5 million pledged by Settling Defendants to this settlement might not suffice to pay all claims.  That concern is unfounded. Settling Defendants never believed that any significant number of people who paid for a distributor starter kit shared Plaintiffs' concerns about Jeunesse, discarded products they could

---

[4]   *See, e.g, Wu v. Sunrider Corp., et al.*, No. 2:17-cv-04825-DSF-SS (C.D. Cal.), Dkt. No. 98 (granting summary judgment to defendants on May 22, 2018); *Market America, Inc., et al. v. Yang, et al.*, No. 1:17-cv-00897-JEP (M.D. N.C.) Dkt. No. 25 (compelling arbitration on July 12, 2018); *Yiru v. WorldVentures Holdings, LLC, et al.*, No. 3:17-cv-02155-S (N.D. Tex.), Dkt. No. 107 (compelling arbitration on September 11, 2018); *Jia, et al. v. Nerium International, LLC*, No. 3:17-cv-03057-S (N.D. Tex), Dkt. No. 144 (compelling arbitration on September 18, 2018).

not resell, etc.  Based on claims to date, the settlement payment will more than suffice to pay all claims.  No *pro rata* reduction will be necessary.  It is unclear at this time whether any settlement funds will revert to Jeunesse, although some reversion remains possible.  Even if the relatively low claims rate in this case did not reflect—as Settling Defendants strongly believe it does—general satisfaction on the part of Jeunesse distributors, "class settlements featuring low claims rates are routinely approved."  *Montoya*, 2016 WL 1529902, at *22.

TINA and Ms. Xiong also take issue with the settlement's requiring a claims process at all.  As Settling Defendants explained to the Court during the hearing on preliminary approval, a claims process is necessary because only individual distributors know the extent to which they profited from product resales.  Jeunesse knows about sales that distributors made through replicated Jeunesse websites, but does not require distributors to report retail sales they make directly.  Similarly, Jeunesse does not know which products (if any) a distributor discarded after purportedly not being able to resell them.  The claims process here is being overseen by an experienced settlement administrator and is not at all cumbersome.  The five-page claim form asks claimants for details about products they claim to have discarded, but claims will not be rejected for a lack of specifics.  Notably, not a single member of the Settlement Class lodged an objection to the claims process or its mechanics.

When parties propose a settlement, "[t]he Court is not tasked with either choosing the payment structure that it believes will provide the best possible relief to all class members or deciding whether a claims-made structure is absolutely necessary, but instead with determining whether the claims-made settlement presented is fair, reasonable, and adequate given the

inherent risks and expense of further litigation." *Wilson*, 2016 WL 457011, at *16.  Here, the parties have more than adequately explained the need for a claims process.

The two cases Ms. Xiong cited do not support her argument that the claims process here is too "cumbersome" to merit approval.  In *Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014), a proposed settlement failed for many reasons, not the least of which being that the class counsel was the lead moving plaintiff's son-in-law, that class counsel vastly misrepresented the value of the proposed settlement, and the class counsel dismissed several other plaintiffs from the suit because they objected to the settlement.  None of those factors is present here. *See Montoya*, 2016 WL 1529902, at *24 (distinguishing *Eubank* where, as here, "[n]ot one of these danger signs is present").  The *Eubank* proposed settlement, moreover, included a 12-page claim form that required "a slew of arcane data" and would have compelled class members to go through arbitration to claim any significant amount of money.  In *Walter v. Hughes Comms., Inc.*, No. 09-2136 SC, 2011 WL 2650711, at *4-5 (N.D. Cal. July 6, 2011), the parties similarly proposed a confusing and long claim form that was far out of proportion to the maximum five-dollar benefit that class members could claim.  Here, by contrast, neither TINA nor Ms. Xiong identifies any aspect of the claim form that they consider unnecessary.

The remainder of TINA's and Ms. Xiong's arguments address the settlement's injunctive relief and the scope of the proposed release.  Their arguments make clear that they misunderstand both.  None of those arguments have merit.

TINA highlights that on July 15, 2016, the Federal Trade Commission ("FTC") publicly announced a settlement with Herbalife International of America, Inc., through which the FTC made clear its current expectations with regard to multi-level marketers' compliance

practices.  *See* TINA Br. at 6 n.2.  Plaintiffs filed their complaint in this matter two weeks after the FTC's announcement, and all of the acts they complain about occurred before the *Herbalife* settlement.   Pre-*Herbalife*, Jeunesse operated fully consistently with then-extant FTC guidance.  After the *Herbalife* settlement, Jeunesse—like many other multi-level marketers— promptly adopted changes to match the FTC's newly-promulgated guidance.

TINA's brief professes surprise that the proposed settlement does not mandate *new* changes by Jeunesse to match the *Herbalife* settlement.  But that is because Jeunesse already made those changes in 2016.  The instant case's proposed injunctive relief deals primarily with a different issue, not present in the *Herbalife* matter, raised uniquely by these Plaintiffs: Jeunesse's using so-called "business development agreements" to welcome new distributors with established "downlines" into the Jeunesse enterprise.  Although Jeunesse believes its prior disclosures to distributors sufficed, it has agreed to injunctive relief as part of the settlement to enhance those disclosures.

Of even greater importance, the presence or absence of *any* injunctive relief in the proposed settlement does not impact the rights of Jeunesse distributors.  If the Court approves the proposed settlement, the release would, like any class action resolution approved pursuant to Fed. R. Civ. P 23(b)(3), apply only to *backward-looking* claims.  Jeunesse is not engaging in any conduct that would give distributors any valid future claims, but if a distributor— including a Settlement Class Member—wants to file a complaint about Jeunesse's conduct after the class period (which ended on the date of preliminary approval), nothing in the settlement precludes a distributor from doing so.  Put another way, because the settlement class period ended on September 11, 2018, if Jeunesse is acting wrongly today, which it is not, its

distributors can sue today.  TINA's and Ms. Xiong's assertions that "class members are forced to forfeit their legal rights forever," TINA Br. at 1, Xiong Br. at 17-18, therefore, are simply wrong.  The law is quite clear that class actions cannot release *prospective* claims and this settlement makes no attempt to do so.

## IV.    CONCLUSION

For the foregoing reasons and as set forth in the papers submitted in support of the parties' motion for final approval, Settling Defendants respectfully request that this Court grant final approval of the class action settlement.


Respectfully submitted,

Dated: December 24, 2018

| | |
|---|---|
| **PEARSON BITMAN LLP** | **KELLEY DRYE & WARREN LLP** |
| By: _/s/ Karl E. Pearson_____ | By: _/s/ Jeffrey S. Jacobson_____ |
| Karl E. Pearson, Esquire | Jeffrey S. Jacobson (*pro hac vice*) |
| Florida Bar No.: 438669 | Glenn T. Graham (*pro hac vice*) |
| kpearson @pearsonbitman.com | 101 Park Avenue |
| 485 N. Keller Rd., Suite 401 | New York, NY  10178 |
| Maitland, Florida 32751 | Telephone:  (212) 808-7800 |
| Telephone:  (407) 647-0090 | Facsimile:  (212) 808-7897 |
| Facsimile:  (407) 646-0092 | jjacobson@kelleydrye.com |
| | ggraham@kelleydrye.com |
| *Attorneys for Defendants Jeunesse, LLC,* | |
| *Wendy R. Lewis, Ogale Ray, Scott A. Lewis,* | *Attorneys for Defendants Jeunesse, LLC,* |
| *Kim Hui and Kevin Giguere* | *Wendy R. Lewis, Ogale Ray, Scott A. Lewis,* |
| | *Kim Hui and Kevin Giguere* |

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on December 24, 2018, I electronically filed the foregoing document with the Clerk of the Court using *CM/ECF*.  I also certify that the foregoing is being served this day upon all counsel of record or *pro se* parties identified in the following Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by *CM/ECF* or in some other authorized manner for those counsel or parties who are not authorized to electronically receive Notices of Electronic Filing.

PEARSON BITMAN LLP

/s/ Karl E. Pearson
Karl E. Pearson, Esquire
Florida Bar No.: 438669
kpearson@pearsonbitman.com
485 N. Keller Rd., Suite 401
Maitland, Florida 32751
Telephone:  (407) 647-0090
Facsimile:  (407) 647-0092

*Attorneys for Defendants Jeunesse, LLC,*
*Wendy R. Lewis, Ogale Ray, Scott A.*
*Lewis, Kim Hui and Kevin Giguere*

**SERVICE LIST**

| | | |
|---|---|---|
| **David Nunzio Ferruci**<br>Dickinson Wright PLLC<br>1850 N. Central Ave., Ste. 1400<br>Phoenix, AZ 85004<br>DFerrucci@dickinsonwright.com | **Jonathan Scott Batchelor**<br>Jonathan Batchelor, PLC<br>200 W. Portland St., # 524<br>Phoenix, AZ 85003<br>Jonathan@batchelorplc.com | **Alan J. Perlman**<br>Roetzel & Andress, LPA<br>Suite 1150<br>350 E Las Olas Blvd<br>Ft. Lauderdale, FL 3301-4254<br>aperlman@dickinsonwright.com |
| **John P. Desmond**<br>Dickinson Wright, PLLC<br>Suite 940<br>100 West Liberty St.<br>Reno, NV 89501<br>jdesmond@dickinsonwright.com | **Charles J. Bartlett**<br>Icard Merrill Cullis Timm Furen & Ginsburg, PA<br>2033 Main St. Ste. 600<br>Sarasota, FL 34237<br>cbartlett@icardmerrill.com | **Glenn T. Graham**<br>**Jeffrey Jacobson**<br>Kelley Drye & Warren LLP<br>101 Park Avenue<br>New York, NY 10178<br>GGraham@KelleyDrye.com<br>JJacobson@KelleyDrye.com |
| **Amanda Rose Dunn**<br>Rywant, Alvarez, Jones, Russo & Guyton, P.A.<br>109 N. Brush Street, Suite 500<br>Tampa, FL 33601<br>adunn@rywantalvarez.com | **Vijay Brijbasi**<br>Roetzel & Andress, LPA<br>Suite 1150<br>350 E Las Olas Blvd<br>Ft. Lauderdale, FL 3301-4254<br>vbrijbasi@dickinsonwright.com | |
| **Chris Wellman**<br>Wellman & Warren LLP<br>24411 Ridge Rte. Ste. 200<br>Laguna Hills, CA 92653<br>cwellman@w-wlaw.com | **Scott W. Wellman**<br>Wellman & Warren LLP<br>24411 Ridge Rte. Ste. 200<br>Laguna Hills, CA 92653<br>swellman@w-wlaw.com | |

PEARSON BITMAN LLP

/s/ Karl E. Pearson
Karl E. Pearson, Esquire
Florida Bar No.: 438669
kpearson@pearsonbitman.com
485 N. Keller Rd., Suite 401
Maitland, Florida 32751
Telephone: (407) 647-0090
Facsimile: (407) 647-0092
Facsimile: (407) 841-9726
*Attorneys for Defendants Jeunesse, LLC, Wendy R. Lewis, Ogale Ray, Scott A. Lewis, Kim Hui and Kevin Giguere*