## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

James J. Aboltin and Pamela J. Knight,
individually and on behalf of all others similarly
situated,

               Plaintiffs,

     v.

Jeunesse, LLC aka Jeunesse Global, Inc., a
Florida limited liability company, MLM Mafia,
Inc., a Nevada Corporation, Online
Communications, LLC, a Wyoming limited
liability company, Wendy R. Lewis, an
individual, Ogale "Randy" Ray, an individual,
Scott A. Lewis, an individual, Kim Hui, an
individual, Jason Caramanis, an individual,
Alex Morton, an individual, Kevin Giguere, an
individual, John and Jane Does 1-100,
individual natural persons, and ABC
Corporations, Companies, and/or Partnerships
1-20,

               Defendants.

Case No. 6:17-cv-01624-PGB-KRS

<br>

**M**OTION **F**OR **F**INAL **A**PPROVAL OF **C**LASS **A**CTION **S**ETTLEMENT

Plaintiffs James J. Aboltin and Pamela J. Knight, (collectively, "Plaintiffs"), respectfully submit this Motion for Final Approval of Class Action Settlement and hereby move the Court for an order granting final approval of the Settlement. The Settlement is fair, reasonable, and adequate. Direct notice has been provided to the Settlement Class as ordered. Only one objection has been filed, but by a person who lacks standing to object. Fewer than 0.01% of class members opted out of the Settlement. The Settlement should be granted final approval.

## I.     Introduction

Plaintiffs respectfully request final approval of the Settlement which provides a $2.5 million cash benefit to the Class, and stipulated corporate reforms designed to address the business practices complained of in the Complaint. No party with standing to object has lodged an objection, and the two briefs filed in opposition to the Settlement evidence a misunderstanding of relevant facts and law applicable to this case. The Settlement is the result of extensive, good-faith negotiations mediated by Lizbeth Hasse, Esq., of JAMS and is fully supported by the Plaintiffs and Class Counsel, who are well-informed about the strengths and weaknesses of this case.

## II.     Statement of Facts and Procedural History

<u>Nature of Claims</u>. Plaintiffs' First Amended Complaint (Doc. 123; the "FAC") alleges the Defendants have engaged in unfair business practices by operating Jeunesse as an illegal pyramid scheme, which has resulted in monetary losses to distributors who signed up to be Jeunesse distributors and purchased products for resale. Plaintiffs allege two specific unfair business practices. First, Plaintiffs allege that the Jeunesse organization emphasizes recruitment over retail sales to outside customers, thereby creating an impermissible pay-for-recruitment "pyramid" organization. Second, Plaintiffs allege that Jeunesse enters into undisclosed deals with high-level multilevel marketers in other organizations to bring their existing organizations over to Jeunesse,

and then holds these individuals out as examples of successful Jeunesse business builders without disclosing the existence of the inside deal. These unfair business practices paint an inaccurately positive picture of the Jeunesse business opportunity.

Plaintiffs and class members can be damaged when they are lured into paying for a "starter kit" and purchasing products with an unrealistic expectation of the prospects of building a business re-selling Jeunesse products. The Settlement was designed to address these business practices and to compensate consumers who were misled and lost money in this way.

<u>Original Complaint</u>. On July 29, 2016, after significant investigation into Defendants' business practices, Plaintiff James J. Aboltin, on behalf of himself and a putative class, filed this Action in the United States District Court for the District of Arizona, naming as defendants Jeunesse, three executives of Jeunesse (Wendy Lewis, Randy Ray, and Scott Lewis), and three top-earning distributors (Kim Hui, Jason Caramanis, and Alex Morton). The original complaint sought a judgment declaring that Jeunesse could not enforce the form of arbitration agreement in effect when Mr. Aboltin contracted to become a Distributor in July 2016, and alleged the following claims for relief: (1) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, (2) conspiracy to commit RICO violations; and (3) consumer fraud under Arizona Rev. Stat. § 44-1521 *et seq.*

<u>Motion to Transfer</u>. On October 3, 2016, Defendants moved to transfer the case to this Court. The Arizona Court took that motion under advisement and, by Order dated October 6, 2016, deferred the Defendants' obligation to respond substantively to the Complaint (*i.e.,* by answering or moving to dismiss) until 21 days after it ruled on the transfer motion.

The parties aggressively litigated the transfer motion, and the Arizona Court ultimately granted the transfer motion on September 12, 2017, and the matter was transferred to this Court.

<u>Defendants' Motions to Dismiss</u>.   Each of the defendants filed motions to dismiss contending the Complaint failed to state a claim, and challenging jurisdiction and process (see Docs. 39, 52, 150, 167, 190, 245). Each of these motions was fully briefed.

<u>First Amended Complaint</u>. On October 30, 2017, Plaintiffs (now including Ms. Knight) filed the FAC.   The FAC pleaded claims against the original defendants and added two corporations—MLM Mafia, Inc., and Online Communications, LLC, as well as another Distributor, Kevin Giguere.   The FAC added claims for state law, Florida (Fla. Stat. §§ 501.204(1), 559.801, and 849.091); and Texas (Tex. Bus. & Com. Code § 17.41); claims for federal securities fraud; and a claim for unjust enrichment.

<u>Motion to Compel Arbitration</u>.   On December 1, 2017, Jeunesse, Wendy Lewis, Randy Ray, and Scott Lewis, moved to compel the arbitration of all of Plaintiffs' claims pursuant to the arbitration agreements allegedly executed by Mr. Aboltin and Ms. Knight.   Jeunesse contends that all Distributors are subject to agreements to arbitrate their disputes with and concerning Jeunesse individually, and not as members of a purported class.   Plaintiffs opposed that motion and contested the enforceability and validity of the arbitration agreements.

<u>Motion to Deny Class Certification</u>.   Also on December 1, 2017, Jeunesse, Wendy Lewis, Randy Ray, and Scott Lewis, moved the Court to deny class certification preemptively, arguing, among other things, that many distributors could not properly be part of the class.

<u>Mediation</u>.   Shortly after the motion to compel arbitration was filed, the Court issued a scheduling order directing the parties to mediation by April 30, 2018. As a scheduled mediation approached, the parties were at loggerheads in settlement negotiations. The pre-answer motions remained pending, including the motion to compel arbitration, several motions to dismiss, and a motion to deny class certification. The Parties moved for an extension of time to participate in

formal mediation. The Court allowed the parties additional time to mediate, but did not rule on the pending motions prior to the mediation deadline. On May 9, 2018, the parties participated in formal mediation without reaching a settlement, but continued to negotiate while litigating the case for nearly two more months, finally agreeing to terms of a settlement on June 29, 2018.

Preliminary Approval and Notice.    On September 13, 2018, the Court granted Plaintiffs' motion for preliminary approval, approving the proposed notice plan, and setting a fairness hearing for January 8, 2018. (Doc. 264 ¶ 10.) The Claims Administrator established a settlement information website and toll-free live assistance line, and provided notice to the Settlement Class, sending over 266,000 emails, nearly 30,000 postcard notices, and over 40,000 secondary mailings to undeliverable or updated addresses, for a total of over 330,000 direct notice contacts.

At the time of filing, the Settlement website has been visited approximately 80,000 times by approximately 20,000 different Settlement Class Members. Roughly 3,300 had filed claims. Nearly 2,000 of those sought refunds for starter kits only; roughly 1,250 filed claims both for starter kit refunds and refunds for discarded products, and 171 filed claims for discarded products alone.    The total value of discarded products at issue in these claims exceeds $1.1 million.    Only 21 Settlement Class Members opted out, and only one objection was filed. *See* Exh. 1.

## III.    The Settlement

The Settlement confers significant benefits to the Settlement Class members by providing reimbursement for starter kits and unsold products, and through corporate reforms by Jeunesse.

### A.    Settlement Class

The Settlement Class consists of all United States-based Distributors of Jeunesse—persons who executed a contract with Jeunesse providing the opportunity to sell or resell Jeunesse products and/or to sponsor other persons to do so; paying for a "starter kit" of materials to facilitate this

business opportunity; directly or indirectly holding a position in the Jeunesse genealogy of Distributors, and/or purchasing Jeunesse products at the discounted prices available only to Jeunesse distributors—between January 1, 2010, and September 13, 2018. Excluded from the Settlement Class are the Defendants, Defendants' employees, and Defendants' family members.

### B. Settlement Benefits

The Settlement benefits the Settlement Class by providing (i) an extension of time until the end of the claims period to return any unsold Jeunesse products, no matter how old, for an uncapped 90% refund; defendant will provide $2.5 million to (ii) refund up to 100% of amounts paid for starter kits, (iii) refund 50% of amounts paid for discarded products, and (iv) pay expenses of settlement administration and the class's attorneys' fees. Defendants also will (v) undertake corporate policy reforms. (Doc. 258 at § 3)

Jeunesse made certain corporate reforms after this lawsuit was filed, agreed to continue those reforms, and agreed to additional reforms, including: tracking of retail sales and distributors electronically, not requiring product purchases to become a distributor, and disclosure of the existence of business development deals. *Id*. at § 5.

The Settlement resolves the parties' disagreement concerning which Settlement Class members are proper claimants by utilizing a "claims-made" structure that allows all distributors the opportunity to file claims based on self-verification, but not presuming any distributor has a proper claim.

## IV. The Settlement Merits Final Approval

"There is an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex." *Ass 'n for Disabled Ams., Inc. v. Amoco Oil Co.,* 211 F.R.D. 457, 466 (S.D. Fla. 2002) (internal citation omitted). "Settlements of

complex cases contribute greatly to the efficient utilization of scarce judicial resources, and achieve the speedy resolution of justice, for a just result is often no more than an arbitrary point between competing notions of reasonableness." *Perez v. Asurion Corp.,* 501 F. Supp. 2d 1360, 1379 (S.D. Fla. 2007) (quoting *Behrens v. Wometco Enters., Inc.,* 118 F.R.D. 534, 538 (S.D. Fla. 1988)). "A class action settlement accordingly should be approved so long as it is fair, adequate and reasonable and is not the product of collusion between the parties." *Ass'n for Disabled Ams.,* 211 F.R.D. 457 at 466 (citations and quotation omitted).

In determining whether the settlement is fair, adequate, and reasonable, courts in the Eleventh Circuit consider:

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

*Bennett v. Behring Corp.,* 737 F.2d 982, 986 (11th Cir. 1984) ("*Bennet Factors*"). "In evaluating these considerations, the district court should not try the case on the merits." *Perez,* 501 F. Supp. 2d at 1380 (citations and quotations omitted). Instead, "the district court may rely upon the judgment of experienced counsel for the parties," and "[a]bsent fraud, collusion, or the like, the district court should be hesitant to substitute its own judgment for that of counsel." *Nelson v. Mead Johnson & Johnson Co.,* 484 F. App'x 429, 434 (11th Cir. 2012).

Where, as here, "the consent decree previously has been preliminarily approved, the decree is 'presumptively reasonable,' and an objector must overcome a 'heavy burden' to prove the settlement unreasonable." *Ass'n for Disabled Ams.*, 211 F.R.D. at 467 (citations and quotations omitted). "And a small number of objectors from a plaintiff class of many thousands is strong evidence of a settlement's fairness and reasonableness." *Id*. (citations and quotations omitted).

**A.    The *Bennett* Factors Support Final Approval of the Settlement**

        1.    <u>The Significant Obstacles to Success at Trial Support Final Approval.</u>

In assessing the first *Bennett* factor, "[t]he likelihood of success on the merits is weighed against the amount and form of relief contained in the settlement." *Lipuma v. Am. Express Co.,* 406 F. Supp. 2d 1298, 1319 (S.D. Fla. 2005). The Court is "not called upon to determine whether the settlement reached by the parties is the best possible deal, nor whether class members will receive as much from a settlement as they might have recovered from victory at trial." *Gevaerts v. TD Bank, N.A.*, No. 1:14-CV-20744-RLR, 2015 WL 6751061, at *5 (S.D. Fla. Nov. 5, 2015) (citations and quotations omitted). The Court is "not to decide the merits of the case or resolve unsettled legal questions." Canupp v. Sheldon, No. 204-CV-260-FTM-99DNF, 2009 WL 4042928, at *10 (M.D. Fla. Nov. 23, 2009).    "[A] trial court in approving class action settlements has neither the duty nor even the right to reach any ultimate conclusions on the issues of fact and law which underlay the merits of the dispute." *Id.*

Although Plaintiffs strongly believe that their claims are meritorious, they recognize significant obstacles to success exist. At the time Plaintiffs entered into the proposed settlement, this Court had *sub judice* a motion to dismiss all of Plaintiffs' claims for failure to state a claim upon which relief may be granted, a motion to deny class certification, and a motion to compel individual arbitration. Although Class Counsel believe those motions lack merit, the Class faced a substantial risk that it would recover nothing, especially in light of the risk that the Court would compel individual arbitration.

Although Plaintiffs believe they had strong, meritorious arguments against compelling these Plaintiffs to arbitration, this Court recently held in a different action that a different version of the Jeunesse's arbitration clause was enforceable.  *See AMC Pinnacle, Inc. v. Jeunesse, LLC,*

Case No. 6:18-cv-1102-PGB-DCI, 2018 WL 6267314 (M.D. Fla. Nov. 30, 2018) (Byron, J.) (denying Jeunesse distributor's motion for preliminary injunction against pending arbitration initiated by Jeunesse).   And although Plaintiffs here argued a different arbitration clause than the one at issue in *AMC Pinnacle*, as well as different factual circumstances, if the Court compelled individual arbitration, then Plaintiffs faced the very real possibility of not being able to pursue the litigation on behalf of the class. Stated somewhat differently, "[i]f [Defendants] were ultimately successful in enforcing mandatory, individual arbitration of the claims raised in the Action, this litigation would have effectively ground to a halt[.]" *In re: Checking Account Overdraft Litig.*, No. 1:09-M D-02836-JLK, 2014 WL 11370115, at 10 (S.D. Fla. Jan. 6, 2014) (slip opinion).   Simply put, Plaintiffs and "Class Counsel were staring down the barrel of [of a number of potentially case dispositive] issues without any assurances whatsoever as to how the Court would rule."   *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1364 (S.D. Fla. 2011).   Plaintiffs faced the prospect of needing to prevail on essentially all the pending motions for the class's claims to survive, whereas Defendants needed prevail on only one of these motions in order to seriously curtail any potential liability.

Based on the uncertainty of nationwide relief for the Settlement Class and the risk created by the Jeunesse arbitration provision, Plaintiffs' likelihood of success on the merits is arguably uncertain while the benefits of the Settlement to consumers are unquestionably strong.

2.    <u>The Settlement is Within the Range of Possible Recovery that is Fair, Adequate, and Reasonable, Given the Circumstances of the Case.</u>

The Settlement's recovery falls within the range of reasonableness when compared with the range of possible recovery at trial and the risks of litigation.

Provable damages are inherently limited.   The primary damages readily ascertainable on

a class-wide basis are payment for "starter kits" to become Jeunesse distributors, and payment for products Class Members were unable to sell. The Settlement provides substantial recovery for these damages, including 50% recovery for discarded products—an element of damages that would be difficult to establish on a class-wide basis at trial. The Settlement allows Class Members to recover up to 100% of the purchase price of their starter kits, 90% of the cost of returnable products they were unable to sell, and 50% of the cost of discarded products. The Settlement provides for Class Members who may allege more significant but individualized damages to opt-out of the Settlement to pursue their individual claims.

3.   The Complexity, Expense, and Likely Duration of Continued Litigation Support Approval of the Settlement

The fourth *Bennett* factor "weighs in favor of settlement approval where the litigation, including the appellate process, involves numerous class members and significant time and expense." Morgan v. Pub. Storage, 301 F. Supp. 3d 1237, 1248 (S.D. Fla. 2016). This factor is further supported where "[t]he claims and defenses are complex; litigating them has been difficult and time consuming," and "recovery by any means other than settlement would require additional years of litigation in this Court and the appellate courts." *Torres v. Bank of Am. (In re Checking Account,* 830 F. Supp. 2d 1330, 1345 (S.D. Fla. 2011).

This action involves complicated questions of fact and law. First and foremost, class action matters are "inherently complex to prosecute because the legal and factual issues are complicated and uncertain in outcome." *Francisco v. Numismatic Guar. Corp. of Am.*, No. 06-61677-CIV, 2008 WL 649124, at *15 (S.D. Fla. Jan. 31, 2008). In addition to the complex nature of class action litigation, the parties' underlying claims may add another dimension of complexity. Class Counsel not only represented Plaintiffs in a class action lawsuit, but they also asserted causes of action

against Defendants for allegedly violating RICO and operating an illegal pyramid scheme under Texas, Florida, and Arizona law, which only adds to the level of complexity presented by this class action case. *See Chapman & Cole v. Itel Container Int'l B.V.*, 865 F.2d 676, 685 (5th Cir. 1989) ("RICO cause[s] of action by definition involve complex litigation and high legal costs"); *see also Bostick v. Herbalife Int'l of Am., Inc.*, No. CV 13-2488 BRO (SHX), 2015 WL 12731932, at \*20 (C.D. Cal. May 14, 2015) (finding that a trial on the merits for an alleged pyramid scheme would require significant discovery and "would no doubt prove to be . . . time-consuming for the parties, the class, and the Court"). Simply put, Class Counsel faced both complex issues and significant litigation demands.

Even assuming Plaintiffs prevailed on the motions to dismiss, the motion to deny certification, and the motion to compel arbitration, and then assuming that Plaintiffs also prevailed at the class certification and summary judgment stages, a trial on the merits would no doubt prove to be expensive and time-consuming for the parties, the class, and the Court. The likelihood of an appeal of both the class certification order and a judgment on the merits suggests that this matter would not reach a final resolution in the near future. In contrast, the proposed Settlement Agreement affords immediate class relief without the attendant risks and costs of trial. This factor therefore favors approval.

4.　　Class Members, Class Counsel, and the Class Representatives Support Approval

"In determining whether a proposed settlement is fair, reasonable and adequate, the reaction of the class is an important factor." *Lipuma v. Am. Express Co.,* 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005). "[A] low percentage of objections points to the reasonableness of a proposed settlement and supports its approval." *Id.* This factor also supports approval where the

objections "lack ... substance." *Perez v. Asurion Corp.,* 501 F. Supp. 2d 1360, 1382 (S.D. Fla. 2007). Here, the Settlement Class consists of over 200,000 individuals. *See* Exh 1. Only one individual, who also opted out of the settlement and therefore lacks standing to object, *Id.*, filed an objection, and, as discussed in the contemporaneously filed response to objections, the objection lacks substance. The sole objector to this class action settlement comprises less than .0005% of the 200,000-member settlement class and only 21 individuals have opted out. As such, the reaction of the settlement class strongly supports final approval. *Perez v. Asurian Corp.*, 501 F.Supp.2d 1360, 1382 (S.D.Fla.2007) (considering the tiny percentage of objectors out of a large member class as weighing in favor of accepting the settlement); *Lipuma v. American Express Co.*, 406 F.Supp.2d 1298, 1324 (S.D.Fla.2005) (same).

Courts also look to "the opinions of class counsel" and "the class representatives" under this factor. *See Leverso v. Southtrust Bank,* 18 F.3d 1527, 1530 n.6 (11th Cir. 1994); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) (the Court may rely on the judgment of counsel and, "should be hesitant to substitute its own judgment for that of counsel."). Class Counsel, who are experienced in class-action litigation and are well-informed about the strengths and weaknesses of the case, strongly endorse the Settlement because it confers substantial benefits upon the Settlement Class and is in the best interests of the Class Representatives and the Settlement Class. The Class Representatives also endorse the Settlement. The fourth *Bennett* factor, therefore, supports approval.

5. The Stage of Proceedings At Which the Settlement Was Achieved Supports Final Approval

The final *Bennett* factor looks to the stage of proceedings at which the settlement was achieved. Courts look at this factor "to ensure that the plaintiffs have access to sufficient

information to adequately evaluate the merits of the case and weigh the benefits of the settlement against further litigation." *Perez*, 501 F. Supp. 2d at 1383.

For over two years, Class Counsel have litigated this case in two separate venues across the country. (Doc. 273-2.) Before filing the original complaint, Class Counsel engaged in an extensive pre-suit investigation into potential claims and Defendants' business practices. *Id.* Class Counsel also exchanged written discovery requests, retained forensic and litigation experts, and conferred with Plaintiffs, other witnesses, and private investigators. *Id.* Moreover, over the course of several weeks Class Counsel engaged in settlement negotiations with Defendants and opposing counsel, which included in-person mediation in Las Vegas, Nevada. *Id.* "Because the parties have expended much effort in analyzing the issues, this Court should find that the parties are at a proper juncture with sufficient information to settle this action." *Access Now, Inc. v. Claire's Stores, Inc.*, No. 00-14017-CIV., 2002 WL 1162422, at *7 (S.D. Fla. May 7, 2002).

Moreover, the fact that the parties began but did not complete formal discovery, and exchanged expert reports but did not depose each other's experts, does not mean that Class Counsel did not have sufficient information to enter into the Settlement or that the Settlement should not be approved, as suggested by Ms. Xiong. "The same basic objection—that formal, adversarial discovery is necessary to ensure a class settlement's fairness—has been rejected in this Circuit." *Lee v. Ocwen Loan Servicing, LLC*, No. 14-CV-60649, 2015 WL 5449813, at *24 (S.D. Fla. Sept. 14, 2015), *objections overruled*, No. 14-CIV-60649, 2015 WL 11181651 (S.D. Fla. Dec. 18, 2015). "Class Counsel were negotiating a global settlement and trying to do so before a possible negative ruling on the enforceability of the arbitration provision. Given Class Counsels' other sources of information, and knowledge about the relative strengths and weaknesses of the [claims in this case], [Ms. Xiong's] objection should not bar approval of the settlement." *Lipuma v. Am.*

*Express Co.*, 406 F. Supp. 2d 1298, 1316 (S.D. Fla. 2005); *see also e.g., Cotton v. Hinton*, 559 F.2d 1326, 1332 (5th Cir.1977) (approving settlement over objection that not enough discovery was conducted because plaintiffs were adequately informed despite fact that "very little formal discovery was conducted"); *Francisco v. Numismatic Guar. Corp. of Am.*, No. 06-61677-CIV, 2008 WL 649124, at *11 (S.D. Fla. Jan. 31, 2008) ("in the context of class action settlements, 'formal discovery is not a necessary ticket to the bargaining table' where the parties have sufficient information to make an informed decision about settlement.") (*quoting Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir.1998)). In sum, Class Counsel had more than enough information to adequately evaluate the merits of the case and weigh the benefits against further litigation. The final *Bennett* factor supports approval of the Settlement.

###### B.    The Settlement Is The Product of Good-Faith, Arms-Length Negotiation

"There is a presumption of good faith in the negotiation process." *Saccoccio v. JP Morgan Chase Bank*, N.A., 297 F.R.D. 683, 692 (S.D. Fla. 2014). "Where the parties have negotiated at arm's length, the Court should find that the settlement is not the product of collusion." *Id*. The presumption of good faith has not been rebutted.

The Settlement Agreement was the result of arm's-length negotiations, assisted by a well-known mediator, Lizbeth Hasse of JAMS. Indeed, the parties aggressively litigated this case for two years before reaching terms of a settlement.

###### C.    No Party With Standing has Lodged An Objection

Two opposition briefs have been filed, one on behalf of Ms. Helen Xiong, who has opted out of the Settlement, (Doc. 284-3), and the other an *Amicus Curiae* brief on behalf of Truth in Advertising, Inc. ("TINA"), a party admittedly without standing (*see* Doc. 270).

1. <u>Ms. Xiong Lacks Standing to Object</u>

Parties who opt-out of a settlement are not affected by the Settlement and lack standing to object. "[I]t is well established that class members may either object or opt out, but they cannot do both." *Carter v. Forjas Taurus S.A.*, No. 1:13-CV-24583-PAS, 2018 WL 3982489, at *13 (S.D. Fla. July 22, 2016), *quoting* Newberg on Class Actions § 13.23 (5th ed.) ("Class members who opt out of the class…are no longer considered class members, and hence Rule 23 does not give them standing to object to the settlement.").

Ms. Xiong opted out of the Settlement on November 26, 2018 (*see* Doc. 284-3). As one of the 21 class members who chose to opt out of the Settlement, Ms. Xiong has excluded herself from the Class, and "Rule 23 does not give [her] standing to object to the Settlement." Newberg § 13.23.

**D.** **Ms. Xiong's Objection is Substantively Wrong**

<u>The Settlement Release is not overbroad</u>. Ms. Xiong challenges the Settlement Release on the ground that the parties do not have standing to release claims brought under various California legal theories and pursuant to California state consumer protection statutes. This argument is misplaced because the scope of claims that may be released in a class action is determined by the factual basis of the claims, not the legal theory underlying the claims. "It is well established law that class actions may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the *<u>identical factual predicate</u>* as the settled conduct." *Saccoccio*, 297 F.R.D at 697 (citing *Lipuma*, 406 F. Supp. 2d at 1317 (citing *Wal-Mart Stores, Inc. v. Visa U.S.A.*, Inc. 396 F.3d 96, 106 (2d Cir. 2005) (emphasis added)). Here, the claims released are based on the business practices that promoted the business by emphasizing recruitment over sales, and for undisclosed business development deals. To the extent that claims are based on these factual predicates, they may be released in this class action regardless of the specific state

laws under which these acts may give rise to a claim.

Ms. Xiong has opted out of the Settlement Class, so she may pursue her claims unaffected by the Settlement. Her claims are before the Federal District Court for the Central District of California, and need not be decided by this Court.

The "claims-made" structure of the Settlement does not render it unfair. Ms. Xiong makes a vague and conclusory challenge to the "claims-made" structure of the settlement and, in doing so, quotes a Seventh Circuit case rejecting an egregious claims-made agreement that is entirely distinct from the agreement here. In *Eubank v. Pella*, cited by Ms. Xiong, Judge Posner reversed the approval of a claims-made, class action settlement that he termed "inequitable--even scandalous." 753 F.3d 718, 721 (7th Cir. 2014). In *Eubank*, the settlement presented to the court reflected "almost every danger sign in a class action settlement," including "fatal conflicts of interest"; opposition by named plaintiffs; a provision requiring class members to risk recovering nothing by submitting their claims to arbitration, where the defendants had reserved defenses, in order to be eligible for any meaningful settlement distribution; an award of only coupons to a portion of the class; twelve- to thirteen-page claim forms requiring class members to submit "a slew of arcane data, including the "product identity stamp," "Unit ID Label," and purchase order number of the product at issue; and an unnecessarily complex settlement notice.

By contrast, the settlement here does not present any of the "danger signs" that defeated approval of the *Eubank* settlement. There are no conflicts of interest, nor was there any collusion between the parties. Class members who submit valid claims forms will receive a settlement award by submitting a straightforward claims form and without needing to provide any supporting documentation. The claims process allows distributors to self-report (1) whether they earned less than the starter-kit fee in commissions or retail sale profits, and (2) to what extent (if any) they

discarded products they purchased for resale but neither resold nor returned to Jeunesse.   Class members have access to a settlement website and toll-free phone number should they have additional questions about the settlement or submitting a claim.   The notice sent to class members makes it clear that claims based on "estimated" information will be considered and approved to the extent possible.

Moreover, unlike the *Eubank* settlement, the settlement makes valuable injunctive *and* monetary relief available to the class, prohibiting Defendants from engaging in the practices complained of for two years following approval, and awarding class members who make a claim monetary relief comparable to that they might have secured had they prevailed at trial.   Obtaining these benefits without confronting any of the risks or expenses associated with further litigation is especially valuable where, as here, Defendants have raised dispositive defenses that have succeeded in similar actions.

TINA and Ms. Xiong's suggestion that claims-made settlements are presumptively unreasonable is directly contradicted by the prevailing authority. "There is nothing inherently suspect about requiring class members to submit claim forms in order to receive payment." *Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 696 (S.D. Fla. 2014) (quotation omitted). Filing a claim form is a "reasonable administrative procedure" which generally does not impose an undue burden on members of a settlement class. *See* Turner v. Gen. Elec. Co., No. 2:05-CV-186-FTM-99DN, 2006 WL 2620275, at *7 (M.D. Fla. Sept. 13, 2006). And the Eleventh Circuit has affirmed claims-made settlements affording far less relief to class members than that afforded here. *See, e.g., Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1238 (11th Cir. 2012) (upholding claims-made settlement that gave class members opportunity to resubmit warranty claims to the defendants through a procedure with enhanced consumer protections); *Nelson v.*

*Mead Johnson & Johnson Co.*, 484 Fed. App'x 429, 432, 434-35 (11th Cir. 2012) (upholding claims-made settlement in which defendant agreed to send claimants free baby formula up to a certain aggregate value).

Here, with more than 200,000 Settlement Class members, direct payment is both a less feasible model than a claims-made model and also a harder sell--a claims process may "strike a proper balance between, on the one hand, avoiding fraudulent claims and keeping administrative costs low, and on the other hand, allowing as many class members as possible to claim benefits." *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d 997, 1010 (E.D. Wis. Aug. 16, 2010). This is particularly important where a case presents a class of this size, and determining amounts to be paid directly would potentially make settlement costlier than litigation. *See Saccoccio v. JPMorgan Chase Bank, N.A.*, 297 F.R.D. 683, 696 (S.D. Fla. 2014) (citing evidence that manual review of all borrowers files for a class of 800,000 "would take a thousand people ... every month").

Moreover, the argument that claims rates are generally low in claims-made settlements is without merit because the parties' settlement provides the vast majority of the class the opportunity to achieve significant recovery. But the settlement's fairness is determined by the opportunity created for the class members, not by how many ultimately submit claims. *See, e.g., Saccoccio*, 297 F.R.D. at 696 (overruling same objection).

**E.      TINA and Ms. Xiong's Objections To The Adequacy Of The Settlement's Monetary And Injunctive Relief Are Baseless**

Settlements are the result of compromise, and a Settlement is not required to provide full relief in order to be adequate. The Ninth Circuit explained:

> Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether

it is fair, adequate and free from collusion. In this regard, the fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness.

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998).

The Settlement Agreement here provides significant economic relief for the Settlement Class through cash awards and refunds for returned products and also provides agreed upon corporate reforms. (*See generally*, Stipulation of Settlement (Doc. 258; "Settlement Agreement").) The economic value of the quantifiable aspects of the Settlement consists of $2.5 million in a cash fund and an additional uncapped product return benefit. (*Id*. at § 4.1) Jeunesse also has agreed to preserve changes to its business model, made after this litigation began, and to make and preserve additional changes, for a contractually agreed upon period of at least two (2) years from the date of the Settlement. (*Id*. at § 5.) Taken together, the Settlement Agreement addresses all issues identified in the First Amended Complaint.

As in *Hanlon*, the fact that the overwhelming majority of the class did not opt out presents significant positive commentary as to its fairness. Moreover, to the extent Ms. Xiong believes that her claims are unique and/or that she is entitled to additional compensation, as with settlement class members generally, the settlement allows her the opportunity to opt out of the Settlement and pursue her claims individually, which she has chosen to do.

Nonetheless, TINA and Ms. Xiong take issue with the adequacy of the settlement. These objections are not based on any good-faith effort to understand this case or the Settlement. Both briefs falsely characterize the Settlement and the state of the case, showing that these objectors could not be bothered to properly examine the terms of the Settlement before objecting to it.

Because these objections misunderstand the value of the relief afforded by the settlement

and fail to take into consideration the relative strengths and weaknesses of the parties' positions in this case, they lack merit. *See Nwabueze v. AT&T Inc.*, No. C 09--01529, 2013 WL 6199596, *8 (N.D. Cal. Nov. 27, 2013) ("That a settlement could potentially have reached a more favorable result for certain individuals in the class does not demonstrate that the agreed-upon settlement is not fair, adequate, and reasonable."); *In re Apple iPhone 4 Prod. Liab. Litig.*, No. 5:10-MD-2188 RMW, 2012 WL 3283432, at *2 (N.D. Cal. Aug. 10, 2012) ("objections seeking a 'better' result are not sufficient to overturn a settlement agreement").

TINA and Ms. Xiong's arguments also fail to account for the significant costs and hurdles the class would have faced had they proceeded with litigation, including the possibility that the Class Representatives' claims would be compelled to individual arbitration. Indeed, both briefs repeatedly compare the Settlement to relief obtained in other cases by the Federal Trade Commission. Plaintiffs are not a federal regulatory authority with the considerable substantive and procedural resources available to such an authority, and the FTC does not face anything close to the sort of risks Plaintiffs face in this case. Accounting for these risks highlights the reasonableness of the proposed settlement. *See e.g., In re: Checking Account Overdraft Litig.*, No. 1:09-M D-02836-JLK, 2014 WL 11370115, at *10 (S.D. Fla. Jan. 6, 2014) (slip opinion) ("If [Defendants] were ultimately successful in enforcing mandatory, individual arbitration of the claims raised in the Action, this litigation would have effectively ground to a halt").

As such, even if "a proposed settlement amounts to only a fraction of the potential recovery[,] [it] does not mean the settlement is unfair or inadequate." *Carter v. Forjas Taurus S.A.*, No. 1:13-CV-24583-PAS, 2016 WL 3982489, at *10 (S.D. Fla. July 22, 2016), *aff'd*, 701 F. App'x 759 (11th Cir. 2017) (*quoting Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988) *aff'd sub nom. Behrens v. Wometco Enters.*, 899 F.2d 21 (11th Cir. 1990)). "This is because

settlements must be evaluated 'in light of the attendant risks with litigation.'" *Carter*, 2016 WL 3982489 at *10 (*quoting Thompson v. Metropolitan Life Ins. Co.*, 216 F.R.D. 55, 64 (S.D.N.Y. 2003).

It is easy enough for [Ms. Xiong and TINA] to claim in hindsight that Settlement Class Counsel could or should have obtained more. It is quite another thing to accomplish that result in the face of all these risks. "Successful outcomes often make risks seem less risky in hindsight than they were at the time," and, even though "inherent in compromise is a yielding of absolutes and an abandoning of highest hopes," final settlement approval orders "almost always override the wishes of some class members for a bigger slice of the pie." *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1348 (S.D. Fla. 2011) (quotation omitted).

"The point is that, but for the Settlement, Plaintiffs and the class faced a multitude of potentially serious, substantive defenses, any one of which could have precluded or drastically reduced the prospects of recovery." 830 F. Supp. 2d at 1348. Although Class Counsel does not believe that these defenses have any merit, courts have been divided on their application in similar cases. The negotiated settlement offers class members significant relief, and particularly so taking these risks into consideration.

### F.     The Other Arguments Raised in the Objections Similarly Lack Merit

Consistent with their apparent lack of concern for understanding the terms of the Settlement, or the facts or circumstances involved in this case, TINA and Ms. Xiong argue factors not even relevant in this case. For instance, Ms. Xiong repeatedly refers to conflict among "subclasses"—but there are no subclasses in this case. It is not clear whether her arguments on this point were inadvertently copied from another brief, whether Ms. Xiong has confused the various benefits available to the Settlement Class with different subclasses, or whether she is referring to

something else. In the course of the discussion, she discusses her understanding of the definition of a pyramid scheme under state or federal law, *id*. at 16, but the relevance of such discussion to any contention regarding an "intra-class conflict" is not readily apparent. In any event, there is no conflict within the Settlement Class. Similarly, both TINA and Ms. Xiong object to the Settlement Release because of a misapprehension that it somehow ratifies future misconduct. The Settlement does not purport to release future claims. Claims related to misconduct committed after the date of preliminary approval will not (and indeed could not) be released.

## V.     The Court Should Approve An Award of $825,000 in Attorneys' Fees and Expenses

As explained in Plaintiffs' Motion for Approval of Attorneys' Fees (Doc. 273; "Attorneys' Fee Motion"), which is incorporated herein by this reference, the attorneys' fees requested in this matter are reasonable under any analysis. No Settlement Class member has objected to the fee award.

In the Eleventh Circuit, "'[a]ttorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class.'" *Faught v. Am. Home Shield Corp.,* 668 F.3d 1233, 1242 (11th Cir. 2011) (quoting *Camden I Condo. Ass'n, Inc. v. Dunkle,* 946 F.2d 768, 772-775 (11th Cir. 1991).

A settlement with ascertainable benefits may be treated as a "common fund" from which a percentage fee may be awarded. *See Poertner v. Gillette Co., 618* F. App'x 624, 628-29 (11th Cir. 2015) (per curiam) (finding value of nonmonetary relief and cy pres award to be part of the "settlement pie" from which percentage of fund for fee award was calculated). A court should award fees "based on a percentage of the total benefits made available, regardless of the actual payout to the class." *Wilson v. EverBank*, No. 14-CIV-22264, 2016 WL 457011, at *13 (S.D. Fla. Feb. 3, 2016). "There is no hard and fast rule mandating a certain percentage of a common fund

which may be awarded as a fee because the amount of any fee must be determined upon the facts of each case." *In re Checking Account Overdraft Litig.,* 2014 WL 12557836, at *10. The Eleventh Circuit has recently reaffirmed that twenty-five percent of the settlement benefits is a "bench mark" attorneys' fee award. *See Poertner,* 618 F. App'x at 628 (citing *Camden,* 946 F.2d at 775); *see also Allapattah Servs., Inc. v. Exxon Corp.,* 454 F. Supp. 2d 1185, 1210 (S.D. Fla. 2006) ("federal district courts across the country have, in the class action settlement context, routinely awarded class counsel fees in excess of the 25% 'benchmark,' even in so-called 'mega-fund' cases.").

## VI. The Court Should Approve Class Representative Service Awards

Plaintiffs respectfully request the Court to approve service awards of $1,500 to class representative James Aboltin and $2,500 for representative Pamela Knight. No objections to the service awards have been filed. Service awards "compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *Allapattah Servs. Inc.,* 454 F. Supp. 2d at 1218. "[T]here is ample precedent for awarding incentive compensation to class representatives at the conclusion of a successful class action." David v. Am. Suzuki Motor Corp., No. 08-CV-22278, 2010 WL 1628362, at *6 (S.D. Fla. Apr. 15, 2010). "Courts have consistently found service awards to be an efficient and productive way to encourage members of a class to become class representatives." *Gevaerts,* 2015 WL 6751061, at 9 (approving service awards of $10,000).

The factors for determining an incentive award include: (1) the actions the class representatives took to protect the interests of the class; (2) how much the class benefited from those actions; and (3) the time and effort the class representatives expended in pursuing the litigation. *Id.* at 9. Applying these factors, the service awards for each Class Representative are eminently fair and reasonable. *See In re Checking Account Overdraft Litig.,* 2014 WL 12557836,

at *10 (awarding $5,000 for each plaintiff); *Diakos v. HSS Sys., LLC,* No. CV 14-61784-CIV, 2016 WL 3702698, at 7 (S.D. Fla. Feb. 5, 2016) (awarding $10,000 to the class representative); *Wilson,* 2016 WL 457011, at *15 (awarding $5,000 to each class representative); *Carter,* 2016 WL 3982489, at *15 (awarding the class representative $15,000).

Both Class Representatives contributed to this litigation, and benefitted the Class, far beyond their individual financial interests. Both contributed hours to advance the interests of the Class. They both contributed to factual investigation by sharing their experiences and evidence with Class Counsel, and participated in calls and meetings with Class Counsel. (Doc. 273-2, ¶¶ 30-31). In addition, each Class Representative reviewed court documents filed on their behalf. The Class Representatives worked with Class Counsel to preserve evidence, make required disclosures, and prepare answers to discovery.

## VII. Plaintiffs Provided Due Process to the Class and Complied with Rule 23's Notice Requirements

Notice to the Settlement Class of the proposed Settlement satisfied Rule 23's requirement of "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *see also Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 173-75 (1974). The Notice also satisfied Rule 23(e)(1)'s requirement that notice of a settlement be "reasonable," -*i.e.*, it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Wal-Mart Stores, Inc. v. Visa U.S.A.,* 396 F.3d 96, 114 (2d Cir. 2005).

The notice's substance and its method of dissemination satisfied these standards. Since the Court approved the notice plan (Doc. 264 at ¶¶ 2-11), the Claims Administrator mailed more than

266,000 emails, and nearly 30,000 postcard notices by first-class mail to individual Settlement Class Members and promptly re-mailed notices to undeliverable or updated addresses. (Exh. 1; Doc. 285-1 at ¶¶ 4-8). The Claims Administrator also established a settlement information website and toll-free phone number maned by live operators for easy access to information about the Settlement, related deadlines and downloadable notice-related documents and court filings. (*Id.* at ¶¶ 12-14). Mailing notices, providing telephone assistance, and a settlement website is "the best notice ... practicable under the circumstances," satisfying Rule 23 and due process.

## VIII. Conclusion

For all the reasons cited above, the Court should grant final approval, award attorneys' fees and expenses in the amount of $825,000, and approve service awards to the Class Representatives.

Dated: December 24, 2018

Jonathan Batchelor PLC

By: /s/Jonathan S. Batchelor
  Jonathan S. Batchelor
and
David N. Ferrucci
Dickinson Wright PLLC
1850 N Central Ave., Ste. 1400
Phoenix, AZ 85004
*Attorneys for Plaintiffs*
*James J. Aboltin and Pamela J. Knight*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 24, 2018, I served the foregoing document via e-mail and U.S. Mail upon all counsel of record in the following Service List below.

### SERVICE LIST

| | | |
|---|---|---|
| **Karl E. Pearson**<br>Pearson Bitman LLP<br>485 N. Keller Road, Suite 401<br>Maitland, Florida 32751<br>kpearson@pearsonbitman.com | **Glenn Timothy Graham**<br>Kelley, Drye & Warren, LLP<br>1 Jefferson Road<br>Parsippany, NJ 07054<br>ggraham@kelleydrye.com | **Amanda Rose Dunn**<br>Rywant, Alvarez, Jones,<br>Russo & Guyton, P.A.<br>109 N. Brush Street, Suite 500<br>Tampa, FL 33601<br>adunn@rywantalvarez.com |
| **Jeffrey S. Jacobson**<br>Kelley, Drye & Warren, LLP<br>101 Park Avenue<br>New York, NY 10178-0062<br>jjacobson@KelleyDrye.com | **Chris Wellman**<br>Wellman & Warren LLP<br>24411 Ridge Rte., Ste. 200<br>Laguna Hills, CA 92653<br>cwellman@w-wlaw.com | **Scott W. Wellman**<br>Wellman & Warren LLP<br>24411 Ridge Rte., Ste. 200<br>Laguna Hills, CA 92653<br>swellman@w-wlaw.com |
| **Charles J. Bartlett**<br>Icard Merrill Cullis Timm Furen<br>Ginsberg, PA<br>2033 Main St., Suite 600<br>Sarasota, FL 34237<br>cbartlett@icardmerrill.com | **Daniel D Maynard**<br>Maynard Cronin Erickson<br>Curran & Reiter PLC<br>3200 N Central Ave., Ste 1800<br>Phoenix, AZ 85012-2443 | |
| | | |

___/s/__Angela Kennard____